IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MONTERIO TYRONE PINCKNEY,

    Petitioner,                                No. CIV S-05-144 FCD CHS P

    vs.

A.K. SCRIBNER, Warden,

    Respondent.              FINDINGS AND RECOMMENDATIONS

_____/

## I. INTRODUCTION

Petitioner Monterio Tyrone Pinckney is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. §2254.  In 2002, Pinckney was convicted in the Sacramento County Superior Court, case 01F04473, of first degree murder with personal use of a firearm, attempted murder with personal use of a firearm, and burglary. He received a sentence of 69 years to life.  In his petition, Pinckney claims that (A) an instructional error violated his due process rights; (B) his involuntary confession was improperly admitted as impeachment evidence; and (C) appellate counsel rendered ineffective assistance. For the reasons that follow, the claims are without merit and the petition should be denied.

/////

/////

1

## II. FACTUAL BACKGROUND

The following facts are drawn from the unpublished opinion of the California Appellate Court, Third District, Case No. C042940.[1]

> On May 30, 2001, defendant accused his wife, Monique, of being unfaithful, hit her repeatedly, and threatened to kill her. Later that day, the pair went to the home of Rosie C., a friend of Monique's mother's, where the argument about Monique's fidelity began again, and again defendant beat Monique.
>
> On June 1, Monique went to sleep at Rosie's home when she was awakened by the sound of her mother screaming and gunshots. After she heard the gunshots, Monique hid in the closet. Defendant ran through the house yelling for Monique to come out, argued with Monique's mother, and threatened to shoot her if she did not tell him where Monique was. Monique stayed hidden until police arrived, then she saw her mother on the living room floor. Monique's mother died from a single gunshot wound to the chest. Multiple bullets and spent casings were found in Rosie's home.
>
> Before surrendering to police, defendant left messages on Monique's answering machine telling her he was still looking for her and threatening to kill her. Upon searching the home, officers found a note from defendant which apologized for killing Monique's mother and stated, "[i]t should have been [Monique]."

(C042940 Opinion at 1.)

## III. APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999). Under AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

---

[1] Opinion was lodged in this record on 11/16/06.

state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

The "contrary to" and "unreasonable application" clauses of §2254(d)(1) are different. Under the "contrary to" clause of §2254(d)(1), a federal court may grant the writ only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405. As the Third Circuit has explained, "it is not sufficient for the petitioner to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent *requires* the contrary outcome." *Matteo v. Superintendent*, *SCI Albion*, 171 F.3d 877, 888 (3rd Cir. 1999) (en banc) (emphasis in original). The state court is not required to cite the specific controlling test or Supreme Court authority, so long as neither the reasoning nor the result of the state court decision contradict either. *Early v. Packer*, 537 U.S. 3, 8-9 (2002).

The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case. *Williams*, 529 U.S. at 410. The focus of this inquiry is whether the state court's application of clearly established federal law is objectively unreasonable. *Id*. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*.

1    This court will look to the last reasoned state court decision in determining
2 whether the law applied to a particular claim by the state courts was contrary to the law set forth
3 in the cases of the United States Supreme Court or whether an unreasonable application of such
4 law has occurred. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S.
5 919 (2003). If relief is precluded by 28 U.S.C. §2254(d), the court may deny the petition without
6 addressing the merits of the claim. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

## IV.  ANALYSIS OF PETITIONER'S CLAIMS

### A.  Instructional Error

While deliberating, the jury sent the following note to the court: "We are interpreting that specific intent and/or mental state means 'conscious of his actions.' Is this correct?" (CT at 351.) The Court prepared the following written response to the question:

> The term "conscious of his actions" is not a legal term that is set forth in the jury instructions of this case.
>
> SPECIFIC INTENT
> When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent.
> The specific intent for the crimes it applies to is set forth in the definition of the crimes.
>
> MENTAL STATE
> Mental state is really self-defining. It means what is going on in a person's mind. This forms their state of mind.
> The mental state required for the crimes it applies to is set forth in the definition of the crimes.

(CT at 355-56.)

Defense counsel agreed that this was a correct statement of the law (RT at 997), but objected to any instruction beyond telling the jury that "conscious of his actions" did not apply and that the definitions of specific intent and/or mental state had already been provided:

4

1  So, what I'm asking the court to do is just literally read that first
2  portion as the court intended to do and just tell the jury the
3  definitions for mental state and specific intent [have] already been provided to them elsewhere in the instructions and leave it at that.

4 (RT at 992-94.)  Counsel argued that the instructions were intended to be self-contained and that

5 no further definitions of specific intent or mental state were applicable.  (RT at 994.)

6        The trial judge disagreed, finding that the jury was "under a misapprehension"

7 that specific intent and mental state equate to consciousness of actions, and that he had a duty to

8 "tell them that's not correct, this is what specific intent is and this is what mental state is."  (RT

9 at 996-96.)  He concluded

10  although we do tell the jurors that they must look to the jury
   instructions for what particular specific intent or what particular
11  mental state is required for a particular crime, nowhere do we tell
   them exactly what specific intent is and mental state is.
12

13 (RT at 997.)  The judge gave the written response as set forth above over defense counsel's

14 objection.

15        In his petition, Pinckney argues that the jury's question implied that the jurors

16 were confused "not only about what mental state was required for each crime, but the impact of

17 the combination of act and intent , i.e., what the defendant's mental state was when the acts

18 constituting the offense were committed."  (Supp. Memo P&A at 15.)  Pinckney now claims that

19 once the trial court rejected defense counsel's request for the shorter and less-inclusive

20 instruction and decided to instruct on the meaning of specific intent and mental state, it had a sua

21 sponte duty to *further* refer the jury to previously given instructions that the law also requires a

22 union or joint operation of act and intent.[2]  (Supp. Memo P&A at 15-16.)

23        "In a criminal trial, the State must prove every element of the offense, and a jury

24 instruction violates due process if it fails to give effect to that requirement."  *Middleton v.*

25 ―――――――――――――――

26    [2] *See* CALJIC No. 3.30, 3.31, and 3.31.5.

5

*McNeil*, 541 U.S. 433, 437 (2004). "Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Id*. A claim of instructional error does not raise a cognizable federal claim, unless the error "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire,* 502 U.S. 62, 71-72, (1991); *see also Henderson v. Kibbe,* 431 U.S. 145, 154 (1977); *Cupp v. Nauhten,* 414 U.S. 141, 146-47 (1973). The issue must be considered in the context of the instructions and the trial record as a whole. *Estelle*, 502 U.S. at 72; *Boyde v. California*, 494 U.S. 370, 378 (1990). The relevant question is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the Constitution. *Estelle*, 502 U.S. at 63 (citing *Boyde*, 494 U.S. at 380).

Upon direct review, the California Court of Appeal, Third District, rejected Pinckney's claim of instructional error:

> [I]f the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." ( *Ibid.*) There is no contention in this case that the original instructions were not themselves full and complete. Accordingly, we must determine whether the trial court properly exercised its discretion in determining its response to the jury.
>
> To properly exercise its discretion, "a court must do more than figuratively throw up its hands and tell the jury it cannot help. It must at least *consider* how it can best aid the jury. It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given." (*People v. Beardslee, supra,* 53 Cal.3d at p. 97, 279 Cal.Rptr. 276, 806 P.2d 1311.)
>
> The court fully satisfied its duty in this respect. The court discussed the jury's question with counsel and considered counsel's arguments. The court also detailed its reasons for giving the particular response, acknowledging its duty to answer the jury's questions, and its understanding of the jury's question. The trial court reasonably concluded the jury was confused about the meaning of specific intent and mental state. The court's "explanation [of the law] was clear and correct." ( *People v. Smithey* (1999) 20 Cal.4th 936, 985, 86 Cal.Rptr.2d 243, 978 P.2d 1171.) The court's response advised the jury their understanding

> was incorrect, clarified the law with a correct statement of what
> specific intent and mental state mean, and advised the jury to return
> to the previously provided instructions for the specific intent
> required for each offense. The trial court properly exercised its
> discretion on this issue.
>
> Furthermore, defendant's complaint that the jury should have been
> reinstructed as to the requirement of a concurrence between
> defendant's acts and his intent is not well taken. The jury was fully
> and completely instructed, including instructions on the
> requirement of a concurrence between acts and intent. The question
> asked by the jury did not raise this issue. Had the jury been
> confused about the concurrence requirement, the record in this case
> indicates they would have asked a further question. This jury had
> previously asked for additional copies of the jury instructions,
> asked for a read back of the prosecutor's closing arguments, and
> then asked its question about specific intent. "This particular jury
> demonstrated that it was not too shy to ask questions, suggesting
> that it would have asked another if it felt the judge's response
> unsatisfactory." ( *Weeks v. Angelone* (2000) 528 U.S. 225, 235-236
> [145 L.Ed.2d 727, 738-739].)

(C042940 opinion at 2-3.)

For the reasons set forth above by the California Court of Appeals, there appears no reasonable likelihood that the jury applied the challenged supplemental instruction in a way that violated the constitution. The jury was fully and accurately instructed and there were no ambiguities, inconsistencies, or deficiencies in any of the given instructions. *See Henderson v. Kibbe*, 431 U.S. at 155 (a petitioner's burden is "especially heavy" where no erroneous instruction was given). Pinckney's argument that the jury may have been more confused than was indicated in their note and in need of re-instruction is pure speculation and does not demonstrate a constitutional violation. *See Id* at 156-57 (possibility that jury might have reached a different verdict pursuant to an additional instruction was "too speculative to justify the conclusion that constitutional error was committed").

For these reasons, the state appellate court's rejection of this claim is not contrary to, nor an unreasonable application of, any federal law as set forth by the Supreme Court. The Supreme Court case cited in Pinckney's memorandum, *Bollenbach v. United States*, 326 U.S. 607 (1946), is distinguishable.

First, in *Bollenbach*, the trial judge gave, in response to a jury question, a cursory supplemental instruction later characterized on review as "mistaken" and "simply wrong." *Id*. at 611, 613. As Pinckney's memorandum asserts, the Supreme Court cautioned that supplemental jury instructions given in response to the jury's mid-deliberations can have a greater impact than initial instructions. *Id*. at 612 ("Particularly in a criminal trial, the judge's last word is apt to be the decisive word"). *Bollenbach*, however, was narrowly decided on specific facts: the jury's question had "clearly indicated that the[y] were confused," and they received a cursory *and* inaccurate response, along with "a plain hint from the judge that a verdict ought to be forthcoming." *Id*. at 612-13. The jury returned only five minutes later with a verdict of guilty. *Id*. at 610. The Supreme Court held that where a supplemental instruction "is a specific ruling on a vital issue *and* misleading, the error is not cured by a prior unexceptional and unilluminating abstract charge." *Id*. at 612 (emphasis added).

At Pinckney's trial, however, the jurors did not express confusion about the concurrence requirement of the act and the intent, nor did the trial judge give a misleading or inaccurate response to their question about mental state and specific intent. *Bollenbach* is inapplicable, and no relief can be granted on this claim.

B.   Involuntary Confession

At trial, Pinckney moved to exclude custodial statements he made after his arrest, claiming they were involuntary. During a hearing on the motion, the following evidence was adduced:

**Detective Jeff Watson**

Sacramento police detective Jeff Watson testified that at about 2:00 a.m. on June 10, 2001, he was called to the Hall of Justice to interview Pinckney. (RT at 24.) Upon entering the interview room, he read Pinckney his *Miranda* rights from a card he carries at all times. (RT at 26-27.) Pinckney affirmatively responded that he understood each right and that, having the rights in mind, he would talk to the detective. (RT at 27-29; 42.) Watson made a report of the

8

interview, but also had an independent recollection:

> [t]he defendant basically explained to me what happened the night of the homicide... It was basically just a question and answer period, mostly of [']can you tell me what happened[']. If there were points I was unclear on I'd ask him to clarify.

(RT at 29.)  Petitioner's answers were responsive to the questions asked, and his description of the events was consistent with the detective's observations of the crime scene.  (RT at 30-38.) There was no indication that Pinckney was having difficulty understanding the questions posed to him; his responses were "relevant."  (RT at 39.)

To Detective Watson, Pinckney seemed "lethargic" and "tired."  (RT at 28.) Watson suspected that Pinckney may have been under the influence of narcotics, and based upon that suspicion, he took care to make "sure he was responding and listening to the questions." (RT at 76.)  Pinckney may have fallen asleep "three to four times" during the interview:

> ...on two occasions I remember specifically and that's what made me think he was still very coherent was he would stop talking, he would go in a nod and close his eyes, and I would sit there waiting. Within ten to twenty seconds he would come back up and continue right were he left off at. [¶]  Without me saying anything.  On two other occasions I would say hey, I'm losing you again or something like that or I'd tap the table and then he'd put his head up and start talking again.

(RT at 38-39.)  At no time during the interview did Pinckney ask to see an attorney.  (RT at 41.)

During this interview Pinckney stated he had not eaten in two or three days.  (RT at 60.)  Before Watson arrived, "a drink and some type of cookies" had been placed on the table within Pinckney's reach.  (RT at 40; 78.)  Pinckney did not eat the cookies (RT at 41) or request help to reach or open them.  (RT at 78.)  Watson recalled that the subject of food came up perhaps "a couple of times," but Watson "never made promises for food."  (RT at 59.)  Never was it stated that Pinckney could have different food, but only if he would speak to Watson.  (RT at 44; 78-79.)

/////

After approximately 45 minutes, Detective Watson discovered that the interview was not being recorded, because there was no tape in the tape recorder. (RT at 42-43.) Watson continued questioning Pinckney, with the tapes running. (RT at 43.) The remainder of the interview was captured entirely on videotape. (RT at 44.)

At the beginning of the videotaped portion of the interview, Watson told Pinckney that no sandwiches were available, and asked if "some chips or something will be okay." (CT at 414.) Pinckney asked, "[y]ou don't have anything solid?" and stated "I haven't ate in like more than two to three days." (CT at 414.) Watson left the room, then returned and said, "[al]l right, about the best I can do, man, is some chips. Okay?" (CT at 414.) Pinckney responded, "[o]kay" (CT at 414) and the chips were placed on the table. (RT at 41.) Pinckney never ate the chips, which were within his reach. (RT at 78.)

Pinckney verbally agreed that he recalled and understood his *Miranda* rights (RT at 414), and then continued to answer questions about his offenses and the events prior to his arrest. At one point, he apparently began to doze off. Detective Watson said "I'm losing you again," and Pinckney made a statement not transcribed. (CT at 418.) After further discussion (RT at 418-20), Pinckney stated, "I'm giving you all this information, man. You couldn't find me a sandwich?" (CT at 420.) Watson reminded Pinckney that it was 3:00 in the morning and said that he had someone "out right now" looking for food. *Id.* Watson indicated that Pinckney would be able to "get some food here pretty quick anyway." *Id.* Pinckney indicated his appreciation. (CT at 420.) After further discussion, Pinckney made a final appeal to Watson:

> Yeah, and you know, I just wanted to, uh, tell you, man, I know you probably seen it all and hear it all- [¶]- but if you ever decide to write a book one of these days- [¶]- I want you to put my story in there.

(CT at 437.)

Pinckney made no further statements about the crimes. While being photographed, he remarked that he had provided "good information" (CT at 439), and the subject

1  again turned to food, with Watson stating, "I'm trying to find you some food the only place I can
2  downtown right now." (CT at 440.) Pinckney said he wanted "something to eat besides that jail
3  food because I got a long- [¶] It's going to be a long time with that jail food. I'm just asking for
4  one little meal- [¶] -before..." (CT at 440-41.) Watson told Pinckney he probably could not get a
5  meal from outside, and Pinckney responded "[O]h." (CT at 441.)

After transport to the jail, Pinckney told Watson he had last used heroin two days prior. (RT at 78.) Laboratory tests taken after the interview indicated that Pinckney had morphine and methamphetamine or amphetamines in his system. (RT at 83.)

### Investigator Lance McHenry

Sacramento County District Attorney Investigator Lance McHenrey observed the unrecorded portion of Pinckney's interview from outside the interview room. (RT at 88; 90.) He observed Watson read Pinckney's *Miranda* rights and obtain an express waiver of those rights. McHenry clearly recalled that Pinckney verbally waived his *Miranda* rights. (RT at 90; 96-97; 106.)

To McHenry, Pinckney appeared "tired" but not "lethargic." (RT at 93; 101.) Pinckney "answered the questions as they were posed to him" without asking for explanation, and did not seem to be confused. (RT at 93.)

### Petitioner

Pinckney's written declaration under penalty of perjury was accepted into evidence, conditioned upon his cross-examination. (RT at 115.) He declared:

> On June 9, 2001, I was involved in an eight-hour standoff with law enforcement before submitting to arrest.
>
> On June 10, 2001, at approximately 2:20 a.m., a detective from the Sacramento Police Department questioned me.
>
> During the first interview, I was not read my rights. However, I informed the detective that I wished to speak to an attorney.
>
> My request for an attorney was ignored and the questioning continued.

11

> During the first interview, I informed the detective that I had not eaten in three days and had not had any sleep. The detective promised to give me something to eat on several occasions.
>
> I had a difficult time staying awake and kept falling asleep throughout the interrogations.
>
> After approximately one hour of questioning, the detective left the room. He later returned and began to question me again.
>
> During the second interview, the detective asked if I remembered my rights. I nodded, believing he was referring to previous instances unrelated to this arrest wherein I had been read my rights.
>
> Though I was extremely hungry and fighting to stay awake, the detective continued to question me. I became confused on several occasions and had a difficult time understanding the questions.
>
> I asked the detective for some food a number of times. The detective kept promising he would give me some food as soon as he was done questioning me.
>
> After he finished asking questions, he left the room again. The detective returned with a photographer and took photos of me.
>
> At no time during the two interrogations did the detective read me my rights.

(CT at 279.)

Pinckney testified that Detective Watson "absolutely" did not inform him of any rights. (RT at 123.) Pinckney asked to speak to an attorney "[f]irst thing as soon as [Watson] walked into the room." (RT at 123.) Watson, however, ignored the request and began questioning him. (RT at 123-24.)

Pinckney further testified that he ingested heroin for the first time in his life at about 2:00 p.m. on the day of his arrest. (RT at 120; 123.) He recalled using methamphetamine at some time prior to his arrest but did not recall when or where. (RT at 122.) Also, he ate and drank nothing during the standoff. (RT at 121.)

Shortly after being arrested, Pinckney was provided with water and an opportunity to speak with his mother. (RT at 118). He initially testified that he was given no food at the Hall

of Justice, but then agreed with the statement that he was given a bag of chips.[3] (RT at 118-19.) He claimed he did not eat the chips because of his handcuffs, but agreed that he never requested assistance. (RT at 119.) Later, he claimed he did not eat the chips because he was "nodding in and out, and [ ] was preoccupied with the questions that the detective was asking." (RT at 125-26.) Later still, he indicated that he did not eat the chips because he was expecting better food after the interview (RT at 126), as Watson "made it sound that as soon as he got what information he wanted out of me that I was going to be able to get a sandwich or a hamburger or some fries or a salad or something." (RT at 127.)

At a suppression hearing before trial, the judge made a factual finding that Pinckney was advised of his *Miranda* rights and waived them before speaking with police. (RT at 139). The trial judge found that, even if Pinckney had ingested narcotics 12 hours prior to the interview, the drugs did not affect "his ability to reason, resist, or understand." (RT at 142.) Further, the assertion that Pinckney was very hungry could not be credited because Pinckney did not eat the food offered. (RT at 142.) The judge did not believe that the handcuffs prevented him from eating and reasoned that, if there was some impediment to his food consumption, he could have, but did not, ask for assistance. (RT at 142.) The judge concluded that "[f]inally, he is not so tired, hungry, mentally impaired that he could not, at the end of the interview, ask the detective to have his story included in a book if the detective ever decided to write one." (RT at 143.)

The motion to suppress was denied. At trial, Pinckney's statements were used to impeach his testimony.

The United States Constitution demands that confessions be made voluntarily in order to be admissible at trial. *Lego v. Twomey*, 404 U.S. 477, 478 (1972). A confession is voluntary if it is "the product of a rational intellect and a free will." *Medeiros v. Shimoda*, 889

---

[3] He maintained that he was not given cookies. (RT at 124; 126.)

F.2d 819, 823 (9th Cir. 1989) (quoting *Townsend v. Sain*, 372 U.S. 293, 307 (1963)); *see also Blackburn v. Alabama*, 361 U.S. 199, 208 (1960).  The test for voluntariness, however, is not merely a question of whether the suspect spoke of free will.  Rather, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

The relevant question is whether it appears, by preponderance of the evidence, that Pinckney's statements were the result of his will being overborne by coercive police conduct. *Fulminante*, 499 U.S. at 288 (whether defendant's statement is "the produce of coercion" depends on whether his "will was overborne"); *Colorado v. Connelly*, 479 U.S. 157, 168 (1986) (reaffirming that "the voluntariness of a confession need only be established by a preponderance of the evidence").  The inquiry must be based on the totality of the circumstances.  *See Winthrow v. Williams*, 507 U.S. 680, 711-12 (1993).  Relevant factors to consider may include the youth of the accused, lack of education, low intelligence, lack of advice to the accused of his constitutional rights, the length of detention, the repeated or prolonged nature of the questioning, or the use of physical punishment such as deprivation of food or sleep).  *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

Considering the relevant factors under *Schneckloth* and the totality of the circumstances of this interrogation, it does not appear that Pinckney's statements were the result of his will being overborne by coercive police conduct.  First, there is nothing in the record suggesting that youth, lack of education, or low intelligence would be factors bearing on this voluntariness determination.  Although Pinckney claims he was not advised of any rights, his assertion is contradicted by the testimony of Detective Watson, Investigator McHenry, and his own indication at the beginning of the videotaped portion of the interview that he recalled and understood when Watson read him his rights.  (RT at 415.)  The length of the interview was relatively short; Pinckney was in the interview room for only two hours and 20 minutes.  (RT at

141.) The questioning was not excessively repeated or prolonged. Although Pinckney claims not to have slept for a substantial period of time prior, law enforcement did not use sleep deprivation as a coercion tactic. *Cf. Ashcraft v. Tennessee*, 322 U.S. 143 (1944) (confession held involuntary where defendant was questioned by relays of officers for 36 hours without opportunity for sleep). Finally, it is undisputed that Pinckney had access to some food, if not the type or quality of food that he desired or expected.

In sum, Pinckney may have been both tired and hungry, however, to the extent these factors existed, they were not the coercive tactics of law enforcement. As such, there is no basis for deeming his statements involuntary. *See Connelly*, 479 U.S. at 164; 167 (absent police misconduct causally related to the confession, there is no basis for deeming it involuntary; all Supreme Court decisions finding a confession to be involuntary "have contained a *substantial element of coercive police conduct*") (emphasis added); *see also, e.g.*, *Mincey v. Arizona,* 437 U.S. 385 (1978) (defendant subjected to 4-hour interrogation while incapacitated and sedated in intensive-care unit); *Greenwald v. Wisconsin,* 390 U.S. 519 (1968) (defendant, on medication, interrogated for over 18 hours without food or sleep); *Beecher v. Alabama,* 389 U.S. 35 (1967) (police officers held gun to the head of wounded confessant to extract confession); *Davis v. North Carolina,* 384 U.S. 737 (1966) (16 days of incommunicado interrogation in closed cell without windows, limited food, and coercive tactics); *Reck v. Pate,* 367 U.S. 433 (1961) (defendant held for four days with inadequate food and medical attention until confession obtained); *Culombe v. Connecticut,* 367 U.S. 568 (1961) (defendant held for five days of repeated questioning during which police employed coercive tactics); *Payne v. Arkansas*, 356 U.S. 560 (1958) (confession obtained after defendant was held for three days with little food and officers informed him that a lynch mob was entering the jail).

Pinckney's statements were voluntarily made and properly admitted at trial. He is not entitled to relief on this claim.

/////

C.     Ineffective Assistance of Counsel

For his final claim, Pinckney alleges that appellate counsel rendered ineffective assistance on direct appeal for not raising the foregoing claim that his statements were involuntarily made and improperly admitted at trial.

The Sixth Amendment guarantees the effective assistance of counsel. A showing of ineffective assistance of counsel has two components. First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. *Id*. at 690; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). In assessing an ineffective assistance of counsel claim, "[t]here is a strong presumption that counsel's performance falls within the 'wide range of professional assistance.'" *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (*quoting Strickland*, 466 U.S. at 689). In addition, there is a strong presumption that counsel "exercised acceptable professional judgment in all significant decisions made." *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990) (*citing Strickland*, 466 U.S. at 689).

The second factor required for a showing of ineffective assistance of counsel is actual prejudice caused by the deficient performance. *Strickland*, 466 U.S. at 693-94. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*.; *see also Williams*, 529 U.S. at 391-92; *Laboa v. Calderon*, 224 F.3d 972, 981 (9th Cir. 2000).

The *Strickland* standards apply to appellate counsel as well as trial counsel. *Smith v. Murray*, 477 U.S. 527, 535-36 (1986); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989). An indigent defendant "does not have a constitutional right to compel appointed counsel to press

nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Counsel "must be allowed to decide what issues are to be pressed." *Id*. There is, of course, no obligation to raise meritless arguments on a client's behalf. *See Strickland*, 466 U.S. at 687-88 (requiring a showing of deficient performance as well as prejudice). Thus, counsel is not deficient for failing to raise a weak issue. *See Miller*, 882 F.2d at 1434. In order to demonstrate prejudice, a petitioner must demonstrate that, but for counsel's errors, he probably would have prevailed on appeal. *Id*. at 1434 n.9.

Pinckney's appellate counsel raised a single issue on appeal: the supplemental jury instruction claim as set forth in subsection (A). He contends that appellate counsel should have instead or in addition raised claim (B), relating to the voluntariness of his confession.

Coercive police conduct is a "necessary predicate" to a finding that a confession was involuntary under federal law, as well as under California law. *People v. Guerra*, 37 Cal.4th 1067, 1093 (2006). As set forth *supra* in subsection (B), the evidence adduced regarding the circumstances of Pinckney's interrogation did not support a finding of coercive police activity. A claim raised on direct appeal that the trial court admitted Pinckney's involuntary confession would have been extremely weak, and counsel's decision not to press it was "within the range of competence demanded of attorneys in criminal cases." *McMann v. Richardson*, 397 U.S. 759, 771 (1970). Petitioner is not entitled to relief on his claim that appellate counsel rendered ineffective assistance in failing to raise the voluntariness claim on appeal.

## V.  CONCLUSION

For all the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written

1  objections with the court and serve a copy on all parties.  Such a document should be captioned
2  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections
3  shall be served and filed within ten days after service of the objections.  The parties are advised
4  that failure to file objections within the specified time may waive the right to appeal the District
5  Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

6  DATED: February 25, 2009

   /s/ Charlene H. Sorrentino
   CHARLENE H. SORRENTINO
   UNITED STATES MAGISTRATE JUDGE